UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

---

REBECCA S. RICKLEY,

      Plaintiff,                                  Case No.  2:16-CV-149

v.

                                             HON. ROBERT J. JONKER

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant,

_____/

## **OPINION**

This is a social security action brought under 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of the Social Security Administration (Commissioner) denying Plaintiff's claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.  The Commissioner has found that Plaintiff is not disabled within the meaning of the Act.

### **STANDARD OF REVIEW**

The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *See Garner v.*

*Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever evidence in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was forty-one years of age on the date of the ALJ's decision. (PageID.128, 153.) She obtained a GED and was previously employed as a waitress.[1] (PageID.153, 171–172.) Plaintiff applied for DIB on May 30, 2013, and SSI on June 13, 2013. In both applications, Plaintiff

---

[1] Plaintiff also testified that she was employed in a variety of other positions. The ALJ determined, however, that only the waitress position qualified as past relevant work. (PageID.140.)

alleged disability beginning September 15, 2012, due to a mental illness, severe depression, schizophrenia, and chronic pain in her hips and pelvis. (PageID.181, 241–252.) These applications were denied on October 8, 2013, and Plaintiff subsequently requested a hearing before an ALJ. (PageID.194–198.) On March 25, 2015, Plaintiff appeared with her counsel before ALJ Brent C. Bedwell for an administrative hearing at which time Plaintiff and a vocational expert (VE) both testified. (PageID.147–179.) On May 12, 2015, the ALJ issued an unfavorable written decision that concluded Plaintiff was not disabled. (PageID.128–142.) On April 20, 2016, the Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision in the matter. (PageID.29–34.) Thereafter, Plaintiff initiated this action under 42 U.S.C. § 405(g).

## ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a

---

[2]1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c) 416.920(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d), 416.920(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed. (20 C.F.R. §§ 404.1520(f), 416.920(f)).

nonexertional impairment as well as an exertional impairment, both are considered in determining the claimant's residual functional capacity (RFC). *See* 20 C.F.R. §§ 404.1545, 416.945.

Plaintiff has the burden of proving the existence and severity of limitations caused by her impairments and that she is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

ALJ Bedwell determined Plaintiff's claim failed at step five. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (PageID.133.) At step two, the ALJ found that Plaintiff suffered from the severe impairments of bipolar disorder, mood disorder, depression, and anxiety. (PageID.134.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (PageID.134–136.) At step four, the ALJ determined Plaintiff retained the RFC based on all the impairments:

> to perform work at all exertional levels but with the following nonexertional limitations: she can only perform unskilled work; she is limited to jobs having only occasional decision making and changes in work setting; she will be off task up to ten percent of the workday, in addition to regularly scheduled breaks; and she can have no more than occasional interaction with coworkers and supervisors as well as no interaction with the public

(PageID.136.) Continuing with the fourth step, the ALJ determined that Plaintiff was unable to perform any of her past relevant work. (PageID.140.) At the fifth step, the ALJ questioned the VE to determine whether a significant number of jobs exist in the economy that Plaintiff could perform

4

given her limitations. *See Richardson*, 735 F.2d at 964. The VE testified that Plaintiff could perform work in the following representative jobs: hand packager (165,000 national positions) and laundry worker (377,000 national positions). (PageID.172–177.) Based on this record, the ALJ found that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy. (PageID.141.)

Accordingly, the ALJ concluded that Plaintiff was not disabled from September 15, 2012, the alleged disability onset date, through May 12, 2015, the date of decision. (PageID.142.)

## DISCUSSION

### 1.     The ALJ's Evaluation of Dr. David Meeker, D.O.'s Opinion.

In support of her application for benefits, Plaintiff submitted three opinions from Dr. David Meeker, her treating physician. The ALJ examined the three opinions, but found they were entitled to only little weight. In her first claim of error, Plaintiff argues the ALJ's decision to assign only little weight to the opinions constitutes reversible error. The Court agrees.

*A.     Dr. Meeker's Opinions and the ALJ's Assessment*

Dr. Meeker authored three opinions all finding Plaintiff was restricted to an extent far greater than as ultimately recognized by the ALJ. In an October 14, 2013, treatment note for example, Dr. Meeker noted that Plaintiff had applied for social security disability benefits and wrote that "I do believe she does, again, suffer from a severe and chronic mental illness, which would preclude her from maintaining self reliable employment. While many patients with significant illness can obtain a job, the question is can they maintain a job; I believe she would have great difficulty in both." (PageID.383.) Similarly, on January 13, 2015, Dr. Meeker filled out a one page

5

worksheet indicating that Plaintiff was totally disabled. Dr. Meeker noted that Plaintiff's disability was due to her severe chronic mental illness and a schizoaffective disorder. (PageID.468.)

Dr. Meeker's most extensive remarks appear in a completed October 28, 2013, psychiatric/psychological impairment questionnaire. On the worksheet, Dr. Meeker wrote that he had first treated Plaintiff on June 10, 2013, and had been seeing her every three to four weeks thereafter. (PageID.391.) He had diagnosed her with a bipolar affective disorder Type I, the most recent episode being depressed with psychotic features. Plaintiff's current GAF score was thirty, and her lowest GAF score over the last year had been twenty-five.[3] He assigned Plaintiff a "guarded" prognosis. (PageID.391.) Based on his clinical interviews with Plaintiff, Dr. Meeker identified several positive findings, including poor memory; oddities of thought, perception, speech or behavior; personality changes; mood disturbances; blunt, flat or inappropriate affect; delusions or hallucinations; pervasive loss of interests; paranoia or inappropriate suspiciousness; and difficulty thinking or concentrating. (PageID.392.) He noted that Plaintiff required hospitalization or emergency room treatment for her conditions in May 2013. (PageID.393.) Dr. Meeker went on to note that Plaintiff had several marked and moderate limitations in the mental activity areas of understanding and memory; sustained concentration and persistence; social interactions; and adaption. (PageID.394–396.)

Dr. Meeker concluded by noting that Plaintiff was incapable of tolerating even low stress work, that she would have both good and bad days, and that were she to work, he would expect

---

[3] These scores would indicate Plaintiff's "behavior [was] considerably influenced by delusions or hallucinations" or that she was experiencing "serious impairment in communication or judgment" or "inability to function in almost all areas." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).

Plaintiff to miss work more than three times a month. (PageID.398.) After summarizing Dr. Meeker's opinions the ALJ assigned them little weight, explaining:

> His opinion does not correspond with treatment records, which document the claimant's improvement with medication (Exh. 6F). Other records by Dr. Meeker indicated that the claimant was alert and oriented with adequate hygiene, appropriate clothing, goal-directed and oriented speech, and a cooperative mood (Exh. 8F). Dr. Meeker's opinion is also inconsistent with the observations by Dr. Hawkins that the claimant's symptoms were much improved with medication and she exhibited good eye contact, did not appear depressed, and presented as a very pleasant individual. (Exh. 1F). Further, Dr. Meeker's assessment is inconsistent with the claimant's ability to perform a range of activities requiring the ability to understand, concentrate, interact with others, and adapt to situations. Such activities include preparing meals, doing chores, driving, going to restaurants, taking care of her young son, planting flowers, going shopping, and searching for a new rental property (Exh. 4F and Hearing Testimony).

(PageID.139.) Plaintiff claims the ALJ's consideration of these opinions fails to amount to good reasons for assigning them less than controlling weight.

### B. *The Treating Physician Doctrine Generally*

By way of background, the treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating physician if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375–76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527). It is undisputed that Dr. Meeker offered an opinion that was subject to the treating physician doctrine.

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health & Human Servs.*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health & Human Servs.*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller*, 1991 WL 229979 at *2 (citing *Shavers,* 839 F.2d at 235 n.1); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286–87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "'are not well-supported by any objective findings' and are 'inconsistent with other credible evidence'" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Id.* at 376–77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Gayheart*, 710 F.3d at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination; (2) nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialization of the

treating source; and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g.*, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 F. App'x 448, 450 (5th Cir. 2007).

### C.     *Analysis of the ALJ's Assessment.*

The ALJ's decision that Dr. Meeker's opinions are inconsistent with the record and Plaintiff's activities fails to survive scrutiny under the treating physician doctrine.

Prior to her alleged onset date, Plaintiff treated with Dr. Carl Hawkins, M.D., with the Mackinac Straits Health System. At a January 20, 2012, visit, Plaintiff complained of sleeping trouble for the last two years that had become worse in the last six months. (PageID.302.) She also had a decreased appetite over the last three to five months and had lost about twenty pounds. Plaintiff felt nausea when she wanted to eat. She also complained of mood swings. Some days she was jumpy or crabby and on others she was easy going. Her boyfriend stated he frequently had to be very careful with what he said because Plaintiff could easily become upset. (PageID.302.) Dr. Hawkins thought Plaintiff had a significant mood disorder and was concerned she could have bipolar disorder as well because of her family history. The doctor prescribed a mood stabilizer. (PageID.303.) A month later, on February 17, 2012, Plaintiff reported feeling much better with her medication. Her swinging moods and crying were dramatically better. She was not feeling depressed and lacked any suicidal ideation. Her energy was also increased. (PageID.301.)

On first blush this would tend to support the ALJ's conclusion that Plaintiff's condition improved with medication. But both of the above records are dated prior to Plaintiff's alleged disability onset date. By October 18, 2012, the first record after Plaintiff's alleged onset date,

Plaintiff told Dr. Hawkins that she was having a rougher time. (PageID.300.) She was stressed with family issues and was also more anxious. The doctor ordered a consult for her increased anxiety. (PageID.300.)

By May 2013 Plaintiff was clearly worse, not better. Plaintiff was hospitalized on May 2, 2013, at the War Memorial Hospital for a period of eleven days. Prior to her hospitalization she had covered her windows with blankets, stayed mostly in bed, and would sit in the corner and rock while talking to herself. She was not sleeping much, not eating, and was unable to care for her child. (PageID.376.) Plaintiff would later describe her condition during this period as being so bad that she wanted to stay in bed all day. She could not complete her household work and had no energy or appetite. (PageID.352.) She also reported feelings of paranoia, that "everyone was out to get me. Everyone was against me. The TV was watching me." (PageID.352.) She reported experiencing severe hallucinations for about a year. She saw spirits, people stepping out of her TV, and snakes and spiders both on and around her. She also had auditory hallucinations manifested by hearing voices speaking negatively about her and her boyfriend as well as putting suspicions in her head. She further had delusions that she was a kidnaping victim who had been murdered and brought back to life. She also experienced olfactory and tactile hallucinations. (PageID.352.)

Plaintiff was initially evaluated at the hospital on May 2, 2013, by Dr. Ahmad Masood. A mental status examination revealed her to be alert and partially cooperative. Speech was coherent, but it took Plaintiff a long time to answer questions. Her thought process was organized, there was no suicidal or homicidal ideation, intent, or plan. She was assigned a GAF score of 20.[4]

---

[4] A GAF score of 11-20 indicates "Some danger of hurting self or others (e.g., suicidal attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." DSM IV at 34.

Dr. Masood admitted Plaintiff to the hospital with a fair prognosis if she complied with treatment. (PageID.305.)

While she was hospitalized, Plaintiff was evaluated by Michelle Serbert, a nurse practitioner. (PageID.306.) Plaintiff reported she had a hard time concentrating and further admitted she would occasionally scratch herself to get attention. (PageID.306.) Consistent with this report, Ms. Serbert's examination noted that Plaintiff had difficulty concentrating during the examination and assessment. She would frequently change the subject and give incomplete answers. (PageID.307.) After these initial evaluations, Plaintiff began being treated with staff from Hiawatha Behavioral Health. (PageID.376.) While Plaintiff was still hospitalized at the War Memorial Hospital, Patricia Ferguson noted that Plaintiff had been admitted for increased signs and symptoms of her bipolar disorder following the death of four of her family members. (PageID.376.) Ms. Ferguson described Plaintiff as paranoid. A hospital social worker reported that at a morning meeting, Plaintiff exhibited thought and speech delays and then would shout answers. Plaintiff reported "buzzing" in her head and butt and said she couldn't think at the same time. She maintained poor eye contact and was not oriented to date or year. She was still psychotic. (PageID.376.) Plaintiff also described auditory and visual hallucinations. They would tell her to say "yes" or "no" and also told her not to harm anyone. She further reported seeing three dimensional things appearing out of the wall and bugs on the floor. (PageID.374.)

Plaintiff began to slowly improve and on May 13, 2013, Plaintiff was discharged after eleven days. Her discharge diagnosis was bipolar disorder mixed with psychotic features. At her discharge Plaintiff denied suicidal ideations or hallucinations. She reported she felt better and was excited to go home. Her sleep and appetite were described as "good." (PageID.369.) She was

scheduled for follow up appointments with Lisette Hoeltzel, a limited licensed social worker, and Dr. Meeker.  (PageID.369.)

Subsequent records indicate Plaintiff clearly was better off than she was during May 2013.  Indeed, there were periods where Plaintiff had no complaints.  But these records appear to be isolated instances in a longitudinal record of continued struggles–the sum total of which are consistent with, not contrary to, Dr. Meeker's opinions.  At an initial assessment with Hiawatha Behavioral Health on May 15, 2013, Plaintiff reported struggling with depression since her teen years.  (PageID.352.)  A mental status examination found Plaintiff to have a normal appearance, a cooperative attitude, normal speech and communication, and calm motor activity.  Her mood was normal and her sleep was good.  But she reported some ongoing feelings of paranoia and persistent auditory hallucinations.  (PageID.360–361.)  Later that month, Plaintiff was still not fully oriented and needed the help of the social worker to fill out her application for disability benefits.  (PageID.347.)  In June, Plaintiff reported continued symptoms of psychosis, including a feeling like her television was speaking to her.  (PageID.345.)  While Plaintiff reported she liked to go walking and camping, she stated she did not get outside much, and the therapist encouraged her to take walks, ride bikes, and to read instead of watching television.  (PageID.345.)  Plaintiff appeared to have limited success at these efforts.  For example, though Plaintiff would later report she had been looking at newspapers and the internet to look for a nicer home for rent, only a few weeks later she stated she had given up on this activity.  (PageID.325, 452.)  Similarly, Plaintiff at times told her care providers she was doing more out of the house.  She was planting flowers, going to garage sales, playing on the swing with her son, and going out to eat with her boyfriend.

(PageID.323, 435.) But again, these appear to be only sporadic activities as Plaintiff would later state she did not do much during the day. (PageID.430.)

Plaintiff also continued to struggle with feelings of paranoia. On June 10, 2013, Dr. Meeker noted that Plaintiff would sometimes look at the ceiling when answering questions, a sign that she might still be responding to internal stimuli. (PageID.339.) Through November 2013, Plaintiff continued to believe that the clinic was not helpful. (PageID.430.) And, in fact, over the winter, Plaintiff's condition appeared to worsen. On February 6, 2014, Plaintiff's therapist called Plaintiff and left a voicemail to give her a warning of discharge because Plaintiff had canceled several appointments and was a no show at several others. The therapist had not seen Plaintiff since December. (PageID.425.) On February 10, 2014, Plaintiff told Dr. Meeker she had experienced a few weeks of depression. (PageID.404.) She felt down during the winter, with decreased interest and increased appetite. She felt somewhat better over the last week, but reported persisting symptoms. She had gained approximately forty pounds since June. (PageID.404.)

On February 19, 2014, Plaintiff was able to better express her emotions, but they were expressed inappropriately at times. Plaintiff reported she had stopped hearing voices but she was lonely without them. (PageID.417.) Notably, Plaintiff could not associate that an increase in hearing voices corresponded with a decline in her life functioning. (PageID.417.) It was also noted Plaintiff had made no progress towards her goals. (PageID.417.)

At an April 30, 2014, therapy appointment, Plaintiff reported that she had not heard voices for the past two months, but was sad because of that and missed them. (PageID.412.) Plaintiff also reported feeling more paranoid. She felt that people were calling the clinic and the clinic was sharing information about Plaintiff with them. (PageID.412.) She also felt that people

13

in the community were calling clinic staff and sharing their thoughts of Plaintiff and that this was changing the way that the clinic staff felt about her. (PageID.412.) On June 9, 2014, Plaintiff told Dr. Meeker that she had been feeling sad lately. She still felt paranoid that others were speaking about her. (PageID.399.)

In sum, the Court concludes that while Plaintiff did improve after her May 2013 hospitalization, the record fails to support the ALJ's determination that the records are inconsistent with Dr. Meeker's opinions. Accordingly, the ALJ failed to provide good reasons, supported by substantial evidence for assigning the opinion less than controlling weight and this matter must be remanded for further consideration of the doctor's opinions.

### 2.     **The ALJ's Evaluation of Plaintiff's Credibility.**

At the administrative hearing, Plaintiff testified that she was impaired to an extent far greater than as recognized by the ALJ. For example, she testified that she was too paranoid to leave her house. These paranoid thoughts included beliefs that others were spreading lies about her (PageID.158–159), that a couple of girls were using black magic and witchcraft against her (PageID.159), and that her therapists were sharing information about her with others. (PageID.161.) Plaintiff testified it was difficult for her to go to the store, and she did so only once a month. She could not go with her younger son to any of his school events, including parent-teacher conferences. (PageID.164.)

After summarizing Plaintiff's testimony, the ALJ found that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (PageID.136.) The ALJ stated that the medical records and Plaintiff's daily activities failed to fully support Plaintiff's allegations. (*Id.,* PageID.138.) The ALJ also referenced Plaintiff's receipt of

14

unemployment benefits, stating "[t]o receive those payments, she indicated to another entity that she was ready and able to work during a time when she now claims disability. This evidence does not bolster her credibility or allegations of disability." (PageID.138–139.)

Plaintiff claims the ALJ's credibility discussion fails to satisfy relevant agency rulings and policies.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, may be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984); *see also Grecol v. Halter*, 46 F. App'x 773, 775 (6th Cir. 2002). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Instead, a claimant's assertions of disabling pain and other limitations are evaluated under the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004).

Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence

fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).

The ALJ first found that Plaintiff's allegations were inconsistent with the medical record and Plaintiff's daily activities. This reasoning largely mirrors the ALJ's logic for assigning less than controlling weight to Dr. Meeker's opinion and accordingly suffers from the same flaws. On remand, therefore, the ALJ should also reevaluate Plaintiff's credibility. The Court will note, however, that there was no error in the ALJ's reference to Plaintiff's receipt of unemployment benefits.

This district, as well as the Sixth Circuit, has recognized the apparent contradiction between a claimant seeking disability benefits while simultaneously receiving unemployment

compensation. *See, e.g.*, *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801–802 (6th Cir. 2004); *see also Loyacano v. Comm'r of Soc. Sec.*, No. 1: 13–cv–144, 2014 WL 1660072, at *5 (W.D. Mich. Apr. 25, 2014) (collecting cases); *Smith v. Comm'r of Soc. Sec.*, No. 1:12–cv–904, 2014 WL 197846, at * 16 (S.D. Ohio Jan. 15, 2014); *Barton v. Astrue*, No. 3:11–cv–1239, 2013 WL 6196297, at * 7 (M.D. Tenn. Nov. 27, 2013).  Plaintiff argues this line of cases no longer applies due to subsequent developments in agency policy.  Specifically, Plaintiff points to an August 2010, memorandum from Frank A. Cristaudo, the Chief Administrative Law Judge for the Social Security Administration.  That memo instructs ALJs that "the receipt of unemployment benefits does not preclude the receipt of Social Security disability benefits. The receipt of unemployment benefits is only one of many factors that must be considered in determining whether the claimant is disabled." *Webster v. Colvin*, 2014 WL 4095341, at *9 (E.D. Tenn., Aug. 19, 2014).  As Chief ALJ Cristaudo explained, "because the disability decisionmaking process is uncertain and quite lengthy, a claimant should not be forced to choose between applying for unemployment and disability benefits." *Id.* Plaintiff argues that this memo precludes consideration of a claimant's receipt of unemployment benefits.  Here, the ALJ did not base the credibility determination solely on Plaintiff's receipt of unemployment benefits.  Rather, the ALJ also noted that other factors, including Plaintiff's daily activities and medical history, combined with the receipt of unemployment benefits stood at odds with her disability claim. (PageID.138–139.)  This was entirely appropriate and is consistent with Magistrate Judge Carmody's decision in *Hughes v. Comm'r of Soc. Sec.*, No. 1:13-cv-1065, 2015 WL 1401330 *8 (W.D. Mich. Mar. 26, 2015), which acknowledged an ALJ may consider the receipt of unemployment benefits.  Moreover, Plaintiff's interpretation of the memo overreads the

17

Administration's policy. As the memo itself states, the receipt of unemployment benefits is a factor that may be considered.

Accordingly, the ALJ did not err in referencing Plaintiff's receipt of unemployment benefits in assessing Plaintiff's credibility, but did err in finding that Plaintiff's complaints were inconsistent with the other records, and therefore this determination should be reconsidered on remand.

### 3.     Remand is Appropriate.

Plaintiff asks this Court to award of benefits. (PageID.602.) While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if "all essential factual issues have been resolved" and "the record adequately establishes [his] entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 644 (6th Cir. 2013). This latter requirement is satisfied "where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176; *see also Brooks*, 531 F. App'x at 644. Evaluation of Plaintiff's claim requires the resolution of certain factual disputes which this Court is neither competent nor authorized to undertake in the first instance. Moreover, there does not exist compelling evidence that Plaintiff is disabled. Accordingly, this matter must be remanded for further administrative action.

### CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **REVERSED** and

the matter **REMANDED** for further factual findings including, but not necessarily limited to, further evaluation of Dr. Meeker's opinion and Plaintiff's credibility.

        A separate judgment shall issue.


Dated:     July 25, 2017                  /s/ Robert J. Jonker
                                                           ROBERT J. JONKER
                                                           CHIEF UNITED STATES DISTRICT JUDGE